**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**HECTOR L. GARCIA, GEORGE CHAMMAS,**
           **Plaintiffs,**

**-vs-**                                     **Case No. 6:05-cv-673-Orl-JGG**

**FLEETWOOD LIMOUSINE, INC., GHALEB ABURISH, SAMIH IBRAHIM ABURISH, and NINA SAMIH ABURISH,**
           **Defendants.**

## ORDER

This cause came on for hearing on January 31, 2007 on the following motion:

| | |
|---|---|
| **MOTION:** | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 60)** |
| **FILED:** | **October 2, 2006** |

**THEREON** it is **ORDERED** that the motion is **DENIED**.

Plaintiffs Hector Garcia and George Chammas seek to hold Defendants Fleetwood Limousine, Inc. ["Fleetwood"], Ghaleb Aburish, Samih Aburish ["Aburish"], and Nina Aburish [collectively, "the Defendants"] liable under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 216(b) ["FLSA"]. Docket No. 50 (amended complaint). Plaintiffs claim that Defendants failed to pay them overtime wages for their work as bus drivers for Fleetwood. *Id.* at 3, 5. Garcia alleges he is owed 499 hours of overtime. Docket No. 63-2 at 1, ¶ 1. Chammas claims he is owed 2,094 hours of overtime. Docket No. 50 at 5, ¶ 27.

Defendants do not dispute that Plaintiffs worked overtime hours, but instead, claim that they are exempt from the overtime provisions of the FLSA.[1]  Defendants have filed a motion for summary judgment (now before the Court) in which they argue that Plaintiffs are exempt employees pursuant to 29 U.S.C. § 213(b)(1), the "motor carrier exemption."  Docket No. 60.  At the request of Defendants, the Court heard argument on the motion on January 31, 2007.

## I.   BACKGROUND

Fleetwood, a Florida corporation doing business in Orange County, Florida, provides transportation by cars, limousines, vans, and buses.  Fleetwood advertises that it provides services by car, limousine, van, and bus to pick up passengers from the airport.  Docket No. 59 at 7 (advertisement).

Garcia worked as a bus driver for Fleetwood from August 23, 2003 through April 29, 2005.  Garcia never made an airport trip while he worked for Fleetwood.  Docket No. 62-3 at 1, ¶ 3; Docket No. 66-3 at 27.  According to Garcia, other Fleetwood drivers picked up passengers from the Orlando International Airport once every five or six months.  Docket No. 66-3 at 10.  Garcia never drove outside of Florida on behalf of Fleetwood; never transported passengers outside Florida; and never heard of any Fleetwood driver transporting passengers out of Florida.  Docket Nos. 62-3 at 1 - 2, ¶¶ 2, 4-5.  In his deposition, Garcia testified that he could refuse assignments from the Fleetwood driver if he wished.  Docket No. 66-3 at 26.

Chammas also worked as a bus driver for Fleetwood from September 1999 through April 2006. In his deposition on August 14, 2006, Chammas testified that he drove the airport route more

---

[1]Defendants also assert a counterclaim, alleging that during their employment with Fleetwood, Plaintiffs drove (without Defendants' permission) and damaged Fleetwood's buses and limousines.  Docket No. 52 at 4 - 5.

than a dozen times, but not more than two dozen times. Docket No. 66-2 at 14-15. In his affidavit dated October 11, 2006 (submitted in support of his memorandum in opposition to the summary judgment motion), Chammas states that he made approximately four trips to the airport during the six-year period he worked for Fleetwood. Docket No. 62-4 at 2, ¶ 6. Chammas never drove outside of Florida on behalf of Fleetwood, and he never heard of other Fleetwood drivers transporting passengers outside of Florida. *Id.* at 1, ¶¶ 2-3. Chammas also testified that he could refuse assignments from the dispatcher. Docket No. 66-2 at 16.

In support of their motion for summary judgment, Defendants submitted an affidavit from Defendant Samyh Aburish ["Aburish"],[2] "Operations Manager" for Fleetwood. Docket No. 59. According to Aburish, Fleetwood regularly transports passengers across state lines and from the Orlando International Airport to various hotels in Florida. *Id.* at 4, ¶ 4. Further, travel agents, some of whom are from outside Florida, offer Fleetwood transportation as part of travel packages. *Id.* Aburish also states that bus drivers are "randomly assigned to intrastate and interstate routes indiscriminately," and that Plaintiffs could "reasonably be expected" to drive to the airport or to drive across state lines. *Id.* at 4-5, ¶ 5. Aburish states that twenty-five to thirty percent of Fleetwood's regular business involves providing transportation from Central Florida to locations outside of Florida, including Atlanta and Washington, D.C. *Id.* at 5, ¶ 6. According to Aburish, more than fifty percent of Fleetwood's bus routes are the airport routes, which involve picking up passengers arriving at Orlando International Airport. *Id.*.

---

[2]The filings refer to Defendant as either Samih Aburish or Samyh Aburish. The affidavit in support of the motion for summary judgment is from Samyh Aburish. *See* Docket No. 59 at 3. The amended complaint names Samih Aburish. Docket No. 50.

In response to Defendants' motion, Plaintiffs submitted the transcript from Aburish's August 14, 2006 deposition. Docket No. 62-2. Aburish testified that he is the "managing director," but not an officer or director of Fleetwood. *Id.* at 3, 4. He did not know the duties of the vice president of Fleetwood, his brother Ghaleb Aburish (who is also a defendant in this case). He did not know the definition of "intrastate." *Id.* at 4, 7. Aburish also testified that Fleetwood had sent its drivers on trips outside of Florida within the last two years, but that he did not know the number of trips or the names of the drivers who made these trips. *Id.* at 8.

At the hearing on the summary judgment motion, Defendants, through counsel, could point to no evidence in the record showing what percentage of Fleetwood's overall business involves transportation of passengers out of state, or to and from the airport. Furthermore, Defendants could point to no evidence in the record explaining the method by which Fleetwood's dispatcher assigns out of state and airport trips to Fleetwood drivers.

## II.   THE LAW

### A.   Standard of Review on Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Jeffery v. Sarasota White Sox*, 64 F.3d 590, 593 - 94 (11th Cir. 1995); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). A moving party discharges its burden on a motion

for summary judgment by showing that there is an absence of evidence to support the non-moving party's case.[3] *Celotex*, 477 U.S. at 325. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits, and to move for summary judgment on the case as a whole or on any claim. *Id*. When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Id*. at 324.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant, and resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989); *Samples on behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). The United States Court of Appeals for the Eleventh Circuit has explained the reasonableness standard:

> in deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." [citation omitted]. The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*Jeffery*, 64 F.3d at 594, *quoting WSB-TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir. 1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should

---

[3] In their motion for summary judgment, Defendants argue that "Plaintiffs have failed to establish that a genuine issue of material fact exists regarding whether Plaintiffs were covered under the Fair Labor Standard Act's ("FLSA") Motor Carrier Act ("MCA") Exemption during their employment with Fleetwood." Docket No. 60 at 1. In doing so, Defendants misstate their burden on summary judgment.

not grant the summary judgment motion. *Augusta Iron and Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. On a summary judgment motion the Court may not weigh the credibility of the parties. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987). If the determination of the case rests on which competing version of the facts or events is true, the case should be presented to the trier of fact. *Id*.

### B.  The Motor Carrier Exemption

The FLSA requires that employers compensate their employees not less than one and one-half times their regular rate for hours worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1). Defendants argue that Plaintiffs are exempt from the payment of overtime wages pursuant to 29 U.S.C. § 213(b)(1), the "motor carrier exemption." This exemption provides that the FLSA's overtime provisions "shall not apply with respect to any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of [the Motor Carrier Act]."

Under the Motor Carrier Act, 49 U.S.C.§ 13501, the Secretary of Transportation ["the Secretary"] has jurisdiction over "transportation by motor carrier and the procurement of that transportation to the extent that passengers, property, or both, are transported by motor carrier . . . between a place in . . . a State and a place in another State [and] . . . a State and another place in the

same State through another State." 49 U.S.C. § 13501(1)(A)-(B). The Motor Carrier Act, 49 U.S.C. § 31502, further provides that the Secretary may establish requirements for the "qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier," and that § 31502 applies to the interstate transportation described in § 13501. 49 U.S.C. §§ 31502(a)(1), (b)(1). A "motor carrier" is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(12). The term "transportation" includes a "motor vehicle . . . related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use; and . . . services related to that movement . . ." 49 U.S.C. § 13102(19)(A)-(B).

As explained by the Eleventh Circuit, the Secretary has the power to establish qualifications and maximum hours of service for employees who:

> (1) are employed by carriers whose transportation of passengers or property by motor vehicle is subject to the Secretary's jurisdiction under the Motor Carrier Act; and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.

*Baez v. Wells Fargo Armored Service Corp.,* 938 F.2d 180, 181-82 (11th Cir. 1991) (citing 29 C.F.R. § 782.2(a)). Thus, the application of the motor carrier exemption depends "both on the class to which [the] employer belongs and on the class of work involved in the employee's job." 29 C.F.R. § 782.2(a).

Plaintiffs do not dispute that Fleetwood is "engaged in the transportation of passengers by motor carrier for compensation." *See* Docket No. 63 at 8. In addition, it is clear that, as full-time bus drivers, Plaintiffs were engaged in activities directly affecting the safety of operation of motor vehicles

in transportation of passengers on the public highways.[4] Therefore, in this case, the Court must determine whether there is a genuine issue of material fact as to: 1.) whether Fleetwood was engaged in interstate transportation; and 2.) whether the Plaintiffs drove passengers in interstate commerce. *See Chao v. First Class Coach Co., Inc.*, 214 F. Supp. 2d 1263 (M.D. Fla. 2001) (substantially similar analysis).

### C. Interstate Transportation and Interstate Commerce

#### 1. Whether the Motor Carrier is Engaged in Interstate Transportation

The employer's overall business, including the number of interstate trips made and the percentage of revenue from interstate trips, is relevant to whether the employer is engaged in interstate transportation. It is not necessary that the number or percentage be particularly high for an employer to be engaged in interstate transportation. *Morris v. McComb*, 332 U.S. 422 (1947). In fact, in *Morris*, the United States Supreme Court found that the Interstate Commerce Commission (now the Secretary) had jurisdiction over a motor carrier whose trips in interstate commerce represented only three to four percent of the carrier's overall business. *Id.* at 132-33.

Another relevant factor is whether the carrier holds itself out to the public as providing interstate transportation through advertising, marketing, or otherwise. *See Chao,* 214 F. Supp. 2d at 1270-71. In *Chao*, the district court found that while there was "no question" that the employer in that

---

[4]*See Morris v. McComb*, 332 U.S. 422, 430 (1947) (stating that the drivers in the case were "full-time drivers of motor vehicles well within the definition of that class of work done by the [Interstate Commerce Commission, now the Secretary and the Department of Transportation] if the work is done in interstate commerce); *Wirtz v. C&P Shoe Corp.*, 336 F.2d 21, 29 (5th Cir. 1964) (distinguishing the activities of "loaders" from the "drivers" involved in the *Morris* case); *see also* 29 C.F.R. §§ 782.2(b)(2), 782.3(a).
  Plaintiffs do not express any agreement that Plaintiffs were engaged in activities directly affecting the safety of operation of motor vehicles, but they make no argument and submit no evidence as to this issue in response to Defendants' motion for summary judgment. *See* Docket Nos. 62, 63.

case was "substantially engaged" in transporting passengers out of state, "[m]erely holding itself out as an interstate common carrier . . . may have been enough to determine [the employer's] status as an interstate motor carrier." *Id.* at 1271 (citing *Brennan v. Schwerman Trucking Co. of Va.*, 540 F.2d 1200, 1204 (4th Cir. 1976)).

Employers who transport solely within a single state are subject to the Secretary's jurisdiction where the transportation is part of a "practical continuity of movement" across state lines. *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1964); *Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37, 40-41 (5th Cir. 1962); 29 C.F.R. § 782.7(b)(1). Once the goods enter into "the channels of interstate commerce," a halt in the movement of the goods does not necessarily mean that they are no longer in interstate commerce. *Walling*, 317 U.S. at 568. Instead, if the stop represents "a convenient intermediate step in the process of getting them to their final destinations, [the goods] remain 'in commerce' until they reach those points." *Id.* The intrastate movement may be part of the "practical continuity of movement" where the "contract or understanding pursuant to which goods are ordered, like a special order, indicates where it was intended that the interstate movement should terminate." *Id.* at 569.

While the *Walling* and *Opelika* cases involved transportation of goods, the analysis is similar for transportation of passengers. Intrastate transportation of passengers is interstate in character if it is part of the "practical continuity of movement" of passengers across state lines. *See Chao*, 214 F.

Supp. 2d at 1270-71; *Garcia v. Pace Suburban Bus Serv.*, 944 F. Supp. 75 (N.D. Ill. 1996); *Bingham v. Airport Limousine Serv.*, 314 F. Supp. 565 (W.D. Ark. 1970).[5]

### 2. Whether the Employees Transport Passengers in Interstate Commerce

In this case, Defendants do not contend that Plaintiffs ever made trips out of Florida. Defendants argue that Plaintiffs drove passengers in interstate commerce by transporting, or being subject to transporting, passengers to the airport and by driving passengers as part of pre-arranged travel packages.

Where a driver engages in mostly interstate activity, but is subject to driving interstate routes, the motor carrier exemption may still apply. *See Morris*, 332 U.S. at 433-35; *Chao*, 214 F.Supp.2d at 1273-74. In *Morris*, the Supreme Court looked at the proportion of interstate-to-intrastate employee activity, the method by which the carrier assigned interstate activity, and the employer's overall business. *Morris*, 332 U.S. at 433-35. The Court noted that the trips made in interstate commerce only amounted to 3.65 percent of the employee's total trips. Nevertheless, the Court determined that the employee drove in interstate commerce because:

> apparently in the normal operation of the business, these strictly interstate commerce trips were distributed generally throughout the year and their performance was shared <u>indiscriminately</u> by the drivers and was mingled with the performance of other like driving services rendered by them otherwise than in interstate commerce. These trips were a <u>natural, integral and apparently inseparable part</u> of the common carrier service of the [employer] and of his drivers.

---

[5]In addition, in a Sherman Act case, the Supreme Court stated that:

[w]hen persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character.

*United States v. Yellow Cab Co.*, 332 U.S. 218, 228 (1947), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752.

*Id.* at 433 (emphasis added).

In *Chao*, the district court acknowledged that in *Morris,* the Supreme Court observed that employer assigned the interstate trips "indiscriminately," but rejected the argument that the Supreme Court "intended indiscriminate assignment to serve as a bright-line test." *Chao*, 214 F. Supp. 2d at 1275. Rather, the "more germane question is whether . . . the drivers in question are reasonably expected to be involved in interstate commerce." *Id.* at 1275-76. The district court further clarified that the Court must therefore determine whether the drivers who have not driven interstate routes in the past could "be reasonably expected to drive such routes now or in the future." *Id.* at 1275. Another court has explained that the Secretary's jurisdiction "extends only to drivers who reasonably could be expected to make one of the carrier's interstate runs, and that means more than a remote possibility." *Garcia*, 944 F. Supp. at 77. This Court agrees, and adopts the "reasonable expectation" test articulated in the *Chao* and *Garcia* cases.

In addition, where the transportation is part of a prearranged package for passengers arriving from out of state, transportation within the state is in interstate commerce for the purposes of the motor carrier exemption.[6] *See Chao*, 214 F. Supp. 2d at 1272. The motor carrier in *Chao* offered transportation within Florida as part of a travel package which was provided by a wholesale travel company and marketed outside of Florida. *Id.* The passengers purchased the travel package, including the prearranged transportation services, before they arrived in Florida. Therefore, the drivers who

---

[6] This makes sense because the transportation would be part of the "practical continuity of movement" of passengers across state lines where the passengers travel within the state in accordance with a pre-existing order or arrangement. *See Walling*, 317 U.S. at 568 (cited above).


transported these passengers within Florida drove "within the continuous stream of interstate travel." *Id.*

### III.    APPLICATION

#### A.    Whether Fleetwood Was Engaged in Interstate Transportation

Defendants argue that Fleetwood is "engaged in more than de minimis interstate commerce" because a "large percentage" of its total business involves interstate transportation, including trips to the airport, out of state, and as part of the prearranged travel packages, and because Fleetwood holds itself out as "an interstate company" by advertising and soliciting business out of state. Docket No. 60. As support, Defendants submitted the Aburish affidavit in which he states that trips out of state and to the airport comprise approximately eighty percent of Fleetwood's overall business (Docket No. 59 at 5, ¶¶ 6-7) and a Fleetwood advertisement that lists varying rates for "Out of Town" service and trips to the airport (*id.* at 7). Defendants also attached several pages of notes, e-mails, and facsimile cover sheets (*id.* at 8-17), which the Aburish affidavit refers to as "merely a sample of the type of communication that Fleetwood engaged in [sic] making interstate travel arrangements with companies outside the state and are representative of the type of arrangements made during the employment of the Defendants at issue in this case" (*id.* at 4, ¶ 4).

Plaintiffs respond by questioning Aburish's credibility, noting that in his deposition, Aburish could not state definition of "intrastate," the duties of Fleetwood's vice president, or the number of trips made by Fleetwood drivers outside of Florida and the names of the drivers assigned to those trips. Docket No. 63 at 2. Plaintiffs point to their own affidavits in which they state that they never drove outside Florida and never heard of any other driver making a trip outside Florida on behalf of

Fleetwood. *Id.* at 3. Garcia further attests that he never went the airport, and Chammas attests that he only made four airport trips. Docket Nos. 62-3, 62-4.

A genuine issue of material fact exists as to whether Fleetwood is engaged in interstate transportation. Other than Aburish's conclusory statements that approximately eighty percent of Fleetwood's overall business involves interstate transportation (including both interstate and airport trips), Defendants submitted no evidence of the number of trips made in interstate transportation and no evidence of the percentage of revenues attributable to those trips. Plaintiffs have submitted a deposition transcript and affidavits that question Aburish's credibility and his knowledge of Fleetwood affairs, and that arguably contradict his statements as to the percentage of business Fleetwood derives from interstate transportation. However, the Court may not weigh credibility on summary judgment. Moreover, the number or percentage of interstate trips need not be particularly high for Fleetwood to be engaged in interstate transportation, but considering the evidence in the light most favorable to Plaintiffs, and resolving all reasonable doubts in the Plaintiffs' favor, the figures are unclear. A genuine issue of material fact remains.

In addition, the single advertisement and the e-mail and facsimile communications fail to demonstrate that Fleetwood holds itself out to the public as providing interstate transportation or provides transportation as part of prearranged travel packages marketed out of state. In his affidavit, Aburish states that the "documents attached as Exhibit A" (which include the Fleetwood advertisement) are a "sample of the type of communication Fleetwood engaged in making interstate travel arrangements with companies." Docket No. 59 at 4, ¶ 4. Other than this broad statement, Defendants offered no evidence related to the advertisement; no evidence explaining the "Out of

Town" service referenced in the advertisement; and no evidence showing how often, to whom, and where Fleetwood advertised, or even whether this particular advertisement was ever disseminated.

Defendants also failed to explain how the ten pages of notes, e-mails, facsimile cover sheets, and facsimiles created by unknown individuals (such as "Goldie Kier") demonstrate that Fleetwood holds itself out as providing interstate transportation such that Fleetwood thus engages in interstate transportation within the meaning of the Motor Carrier Act. *See, e.g.*, Docket No. 59 at 9. Further, the evidence falls far short of proving that Fleetwood offers to transport tourists as part of prearranged travel packages in which the tourists form a "continuity of movement" across state lines. Despite Aburish's vague statements about travel packages in his affidavit and deposition, the evidence does not even prove that Fleetwood offers transportation as part of travel packages.

### B. Whether Plaintiffs Transported Passengers in Interstate Commerce

A genuine issue of fact also exists as to whether the Plaintiffs transported passengers in interstate commerce. Defendants do not contend that Garcia or Chammas ever made trips outside of Florida. Instead, Defendants argue that Garcia and Chammas could reasonably be expected to make out of state or airport trips.

Defendants submitted almost no evidence to support their argument. As discussed above, the evidence of prearranged travel packages is vague and unclear. Further, at the hearing, Defendants' counsel could point to no evidence in the record explaining the method by which Fleetwood's dispatcher assigns out of state and airport trips to Fleetwood drivers. In support of their motion, Defendants, in fact, filed deposition transcripts in which both Garcia and Chammas testified that they could refuse assignments from the dispatcher if they wished. *See* Docket Nos. 66-2 at 16, 66-3 at 26.

Garcia further testified that he never made a trip to the airport on behalf of Fleetwood. Docket No. 66-3 at 27. Chammas testified that while it would be "hard to say the amount," he made more than a dozen, but not more than two dozen, trips to the airport during his six-year employment with Fleetwood. Docket No. 66-2 at 14-15.

Defendants failed to discharge their initial burden on summary judgment. Moreover, Plaintiffs have shown that there is a genuine issue of material fact for trial as to whether the Plaintiffs drove in interstate commerce. *See* Docket Nos. 62-3 (Garcia affidavit); 62-4 (Chammas affidavit); *see also* Docket No. 63 at 4-5.

As a matter of law, Defendants are not entitled to judgment that Plaintiffs are exempt employees under the motor carrier exemption. Defendants' motion for summary judgment [Docket No. 60] is therefore **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on February 14, 2007.

*/s/ James G. Glazebrook*
JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties