# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

HECTOR L. GARCIA,
GEORGE CHAMMAS

              **Plaintiff,**

-vs-                           **Case No.  6:05-cv-673-Orl-KRS**

FLEETWOOD LIMOUSINE, INC.,
GHALEB ABURISH, individually,
SAMIH IBRAHIM ABURISH, individually,
NINA SAMIH ABURISH, individually
                        **Defendants.**

_____

## TRIAL ORDER

       This cause came on for a non-jury trial before Magistrate Judge James G. Glazebrook on April

5, 2007.  After Judge Glazebrook's death, counsel for all parties appeared before me for a status

conference.  The parties consented to disposition of the case by me, and requested that the matter be

submitted on the existing record, with each side being given the opportunity to file post-trial

memoranda of law.  Doc. No. 94 at 3-4.  The memoranda of law have been submitted, doc. nos. 98,

99, I have reviewed the trial transcript, and I am otherwise thoroughly familiar with the case file.

Accordingly, the case is ripe for resolution.

       As a preliminary matter, counsel for Defendants argues that Judge Glazebrook made findings

of fact and conclusions of law on the record at the conclusion of the trial.  After review of the trial

transcript, I conclude that while Judge Glazebrook stated his intended ruling, he did not make findings

of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).  Rather, Judge

Glazebrook expressly stated that he would lay out his ruling through a written order.  Doc. No. 96 at

253 (Trial Transcript hereinafter cited as "TR.").

Upon a *de novo* review of the trial transcript, I render a verdict in favor of Defendants Fleetwood Limousine, Inc., Samih Ibrahim Aburish, Nina Samih Aburish and Ghaleb Aburish. I also find that Defendants abandoned their counterclaim.

## I.    **FINDINGS OF FACT**.

1.      Fleetwood Limousine, Inc. ("Fleetwood") was founded in 1997, and has its business office in the Orlando, Florida area. TR. 157.

2.      Samih Ibrahim Aburish ("S.I. Aburish") is the founder and managing director of Fleetwood. TR. 15, 156-57. He is in charge of the daily operation of Fleetwood. TR. 157.

3.      Nida Aburish is the Chairman, President and 100% shareholder of Fleetwood. TR. 15-16.

4.      Ghaleb Aburish is the Vice-President of Fleetwood. TR. 16.

5.      Goldie Kier began work for Fleetwood in 2003 as the office manager, receptionist and bookkeeper. TR. 181-82, 196.

6.      Gustavo ("Gus") Carvajal began work for Fleetwood in 1999 as the dispatching supervisor. TR. 197-98.

7.      Fleetwood transports passengers on buses operated on interstate highways. TR. 180.

8.      Sometime before 2001, Fleetwood obtained a certificate from the Interstate Commerce Commission (ICC) permitting it to transport passengers in interstate and foreign commerce. TR. 161-62. *See also* Def. Ex. 3. It maintains its vehicles in accordance with federal regulations. TR. 21.

9.      The number of hours that bus drivers working for Fleetwood can drive are regulated by the Department of Transportation (DOT). TR. 172, 192. Fleetwood maintains logs of the number

of hours each driver works.  TR. 21.  DOT inspects Fleetwood's safety and hourly records at least once a year.  TR. 21-22, 173, 192-94.

10.     Fleetwood paid its drivers $8.00 per hour which later increased to up to $10.00 per hour.  TR. 171.

11.     Fleetwood drivers were required to drive any route assigned to them.  TR. 30, 56-57, 76, 78, 200.[1]

12.     All Fleetwood trips are prepaid to Fleetwood.  Drivers do not collect from the passengers.  TR. 209.

13.     Fleetwood has contracts with hotels in the Orlando area to transport the hotels' guests. Fleetwood is paid by the hotels for this transportation.  TR. 17.

14.     Fleetwood also enters into contracts with travel agents, tour businesses and conventions for transportation of passengers within Florida, which it refers to as charter work.  These contracts are done on a trip by trip basis.  TR. 18-19, 48-49, 53, 157-58.  These groups handled tours for individuals traveling to Orlando from outside Florida.  TR. 48-49, 163; *see also* TR. 162 (Fleetwood  usually transports out-of-state and international customers), 169 (approximately 95% to 98% of the passengers on charters were from outside Florida).  This work included picking up passengers at the airport and Amtrak station.  TR. 55-56, 158.

---

[1] The evidence was disputed whether Plaintiffs were ever told that they must be available to travel outside Florida.  *Compare* TR. 44-45 *with* TR. 66-67.  I need not resolve this credibility issue for purposes of determining the application of the motor carrier exemption.

-3-

15.    Additionally, airline carriers contracted with Fleetwood to pick up flight crews at the airport and transport them to Orlando area hotels and from the hotels back to the airport.  TR. 46-48, 58-59.  The airline crews had traveled to Orlando from places outside Florida.  TR. 48.

16.    Fleetwood advertises its services to include "Out of Town" trips.  Def. Ex. 7; *see also* TR. 159, 231-34 (Fleetwood distributed 10,000 to 15,000 of the advertisements).  One or two months before the trial in this case, Fleetwood drivers went to Savannah, Georgia, and to Biloxi, Mississippi.  TR. 21, 26.  On an unspecified date, a Fleetwood driver also went to Washington, D.C.  TR. 27.[2]

17.    Fleetwood drivers routinely worked more than forty hours a week, but were not paid overtime compensation.  TR. 171-72.  S.I. Aburish checked with lawyers and determined that Fleetwood was not required to pay overtime compensation to its drivers.  TR. 146-47.

18.    In approximately 2002, a representative from the Department of Labor reviewed Fleetwood's records based on a report from a driver that Fleetwood did not pay overtime compensation.  The Department of Labor did not take any action.  TR. 173-74, 196.

19.    Plaintiff Hector L. Garcia was employed by Fleetwood from 2003 through 2005 as a bus driver.  TR. 63-64, 68-69.[3]  He has a commercial driver's license (CDL).  TR. 77, 90. On his application, Garcia indicated that he could travel if a job required it.  TR. 37–41 & Def. Ex. 22(D)(6).

---

[2]  These out-of-state trips did not occur on days when Plaintiff Garcia was at work.  TR. 67.

[3]  It appears that Garcia was employed by American United Employers as of September 2003. Def. Ex. 22(D)(10).  If American United Employers was a staffing agency, as it appears may be the case from the exhibits introduced at trial, Fleetwood could, nevertheless, continue to be the employer of Garcia for purposes of the FLSA.  *Cf.* 29 C.F.R. § 791.2(b)("Joint Employment").  No argument has been made by any party that Garcia's employment by American United Employers alters the analysis of the legal issue presented at trial.

In a Driver History form dated August 21, 2003, Garcia indicated that his "radius of use" of Fleetwood vehicles was over 100 miles. Def. Ex. 22(D)(8).

20.    Garcia first drove a shuttle route to Downtown Disney. TR. 74. Thereafter, he drove a tip route, which is a route between hotels and theme parks for which drivers were allowed to accept tips. TR. 64-65, 127-30.

21.    Garcia never drove outside Florida. TR. 67, 216.

22.    There was a dispute with respect to whether Garcia ever drove passengers to the airport. TR. 118, 206, 215.[4]  Garcia admitted driving one charter group to an Amtrak station. TR. 119-21, 123, 178.

23.    Garcia worked 499 hours of overtime while employed by Fleetwood, for which he was not compensated at one and one-half times the regular rate at which he was employed. Doc. No. 75 at 11. Garcia was paid $8.00 per hour from the commencement of his employment to December 17, 2003. Effective December 18, 2003, he was paid $8.25 per hour. Def. Ex. 22(D)(1).

24.    Garcia asked the dispatcher supervisor, Gustavo Carvajal, why Fleetwood did not pay overtime. Gus told him to take it up with S.I Aburish. TR. 119.

25.    Plaintiff George Chammas was employed by Fleetwood between 1999 and 2005. He primarily drove passengers to theme parks. TR. 131.

26.    Once a year, Chammas picked up passengers at the airport and took them to a hotel. TR. 132, 134-37.

27.    Chammas never drove outside Florida. TR. 141, 215.

---

[4]  I need not make a credibility finding, because there was no dispute that Garcia could have been assigned to drive passengers to and from the airport.

28.     Chammas worked more than forty hours a week, but he was not paid one and one-half times his regular rate of pay for his overtime work.  TR. 132.  As of March 2003, Chammas was paid $8.25 per hour.  Plf. Ex. 5.  As of April 2004, Chammas was paid $8.40 per hour.  *Id.*  As of April 2005, Chammas was paid $9.00 per hour.  *Id.* The overtime hours Chammas worked are set forth in a summary chart admitted into evidence.  Plf. Ex. 6.

**II.     CONCLUSIONS OF LAW**.

1.     Under the Fair Labor Standards Act (FLSA), an employer must pay one and one-half times the employee's regular rate for all hours worked in excess of forty hours per work week.  29 U.S.C. § 207(a)(1).

2.     There is no dispute that Fleetwood is an employer as defined by the FLSA.

3.     There is no dispute that Plaintiffs were employed by Fleetwood.

4.     There is no dispute that each Plaintiff worked more than forty hours a week but was not paid one and one-half times his regular rate of pay by Fleetwood.

5.     The only defense Fleetwood raised in this case was that its drivers are exempt from the FLSA.  Doc. No. 52 at 3; Doc. No. 75 at 5-8.

6.     Defendants have the burden of proving by a preponderance of the evidence that they were exempt from payment of overtime compensation to Garcia and Chammas under the "motor carrier exemption," 29 U.S.C. § 213(b)(1). *See Atlanta Prof'l Firefighters Union v. City of Atlanta*, 920 F.2d 800, 804 (11th Cir. 1991).

7.     The Court must construe all exemptions from the overtime provisions of the FLSA narrowly against the employer. *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 625 (11th Cir. 2004).

-6-

8.      The motor carrier exemption provides that the FLSA's overtime provisions "shall not apply with respect to any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of [the Motor Carrier Act]."  29 U.S.C. § 213(b)(1).

9.      "The power of the Secretary of Transportation to establish maximum hours and qualifications of service of employees . . . extends to those classes of employees and those only who: (1) Are employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under . . . the Motor Carrier Act . . . , and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles[5] in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act."  29 C.F.R. § 782.2(a).

10.     Under the Motor Carrier Act (the "Act"), the Secretary of Transportation (the "Secretary") has jurisdiction over "transportation by motor carrier and the procurement of that transportation to the extent that passengers, property, or both, are transported by motor carrier. . . between a place in . . . a State and a place in another State [and] . . . a State and another place in the same State through another State."  49 U.S.C. § 13501(1)(A)-(B).

11.     A "motor carrier" is defined as "a person providing commercial motor vehicle transportation for compensation."  49 U.S.C. § 13102(14).  There is no dispute that Fleetwood is a motor carrier as defined by the Act.  *See* Docket No. 88 at 6.

---

[5] Turning to the second factor of the exemption, as full-time drivers of motor vehicles, Garcia and Chammas's work directly affected the safety of operation of motor vehicles in the transportation of passengers on public highways to the extent that work is done in interstate commerce.  *Morris v. McComb*, 332 U.S. 422, 430 (1947).

12.     Fleetwood engages in transportation by motor carrier and the procurement of such transportation between Florida and other states when it advertises for and transports passengers between Florida and other states. *See, e.g., Morrison v. Quality Transports Servs., Inc.*, 474 F. Supp. 2d 1303, 1309 (S.D. Fla. 2007)(and cases cited therein).  As such, it is within the jurisdiction of the Secretary.

13.     Simply because the Secretary has jurisdiction over Fleetwood does not give her jurisdiction over all drivers employed by Fleetwood.  *See Morrison*, 474 F. Supp. 2d at 1309. Correspondingly, "the activities of drivers . . . in connection with transportation that is not in interstate . . . commerce within the meaning of the Motor Carrier Act provide no basis for exemption" under the FLSA.  29 C.F.R. § 782.2(d).

14.     The Secretary's jurisdiction under the Act "extends 'only to drivers who reasonably could be expected to make one of the carrier's interstate runs, and that means more than a remote possibility.'" *Morrison*, 474 F. Supp. 2d at 1309  (quoting *Garcia v. Pace Suburban Bus Serv.*, 955 F. Supp. 75, 77 (N.D. Ill. 1996)).

15.     Fleetwood advertised its ability to drive passengers from and to Florida from other states.  The evidence established that Fleetwood actually conducted such trips during that time that it employed Garcia and Chammas.  Even though neither Garcia nor Chammas drove any interstate trips, they could have been assigned to do so.  Therefore, Garcia and Chammas could reasonably have been expected to drive an interstate trip for Fleetwood. *See Morris*, 332 U.S. at 431-36.

16.     With respect to purely intrastate trips, the regulations relating to the FLSA presume that transportation within a single state is in interstate commerce when "it forms a part of a 'practical

-8-

continuity of movement' across State lines from the point of origin to the point of destination" unless the ICC, the Secretary or the courts hold otherwise.  29 C.F.R. 782.7(b)(1).

17.    The ICC has found that "motor transportation wholly within a single State of passengers, or groups of passengers, between an airport and another point in the same State, either prior or subsequent to an interstate air movement from or to the airport, (1) is an intrastate movement where there is no arrangement between the motor carrier and the air carrier for continuous passage or interchange, and (2) is an interstate movement where there is an arrangement (referred to as a 'common arrangement' or 'through ticketing') between the motor carrier and the air carrier for continuous passage or interchange." *In re Kimball*, 131 M.C.C. 908, 917 (I.C.C. 1980).

18.    Fleetwood has contracts with air carriers for transportation of airline crew members between the airport and hotels.  This activity is interstate commerce as interpreted by the ICC in *Kimball*.  Because Chammas actually drove airport routes, and Garcia reasonably could have expected to be assigned an airport route, both Garcia and Chammas could reasonably have expected to have driven airline crew members to and from the airport.

19.    Accordingly, based on the preponderance of the evidence, because Garcia and Chammas could reasonably have been expected to drive interstate routes and intrastate routes that are considered interstate under the governing law, Garcia and Chammas were exempt from the FLSA under the motor carriers exemption.[6]

------

[6]  Because I find that Garcia and Chammas reasonably could have been expected to drive Fleetwood routes that constitute interstate commerce, I need not address whether the charter routes, tip routes and shuttle routes not involving airline crew members constitute interstate commerce for purposes of the Act.

20.     Defendants abandoned their counterclaim by failing to include it in the pretrial statement, Local Rule 3.06(e), and by failing to offer evidence in support of it at trial.

## III.   CONCLUSION.

Accordingly, it is **ORDERED** that the Clerk of Court shall enter a judgment in favor of Defendants Fleetwood Limousine, Inc., Samih Ibrahim Aburish, Nina Samih Aburish and Ghaleb Aburish and against Plaintiffs Hector L. Garcia and George Chammas with respect to Count I and Count II of the Second Amended Complaint and Demand for Jury Trial, doc. no. 50.  It is further **ORDERED** that the counterclaim is **DISMISSED**.  After judgment is entered, the Clerk of Court is directed to close the file.

**DONE** and **ORDERED** in Orlando, Florida on November 5, 2007.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record

-10-